# THE HAZELTON BOILER COMPANY

## *v.*

# THE HAZELTON TRIPOD BOILER COMPANY *et al.*

*Filed at Ottawa October 14, 1892.*

1. CORPORATION—*of another State—enjoining use of a similar name by a corporation of this State.* A corporation of New York City filed its bill against a similar corporation of this State, to restrain the latter from interfering with the business of the former, they both being the manufacturers and sellers of steam boilers of similar pattern and construction. It appeared that both companies sold on orders direct from purchasers, and no fraud or deception by the defendants was shown, or that it ever attempted to palm off its boilers as being of complainant's make, and the only confusion that occurred was owing to the similarity of the two corporate names: *Held,* that the bill could not be maintained.

2. A court of equity will not, at the suit of a corporation of another State, enjoin a corporation of this State from the use of its corporate name, adopted before the organization of the complainant company. A foreign corporation can not, in our courts, contest the right of a domestic corporation to the corporate name given it by this State in its articles of incorporation.

3. SAME—*right of foreign corporation to enter this State.* A foreign corporation may not come into this State as a matter of legal right, but only by comity, and it will not be allowed to come here for the purpose of asserting rights in contravention of our laws or public policy. It is competent for this State, when it sees fit, to debar any and all foreign corporations from doing business here, and what it may do by chartering corporations of its own can not be called in question by corporations which are here only by a species of legal sufferance.

4. SAME—*statute prohibits license to a second corporation of substantially the same name.* In the formation of domestic corporations the statute of this State prohibits a license to be issued to two corporations of the same name. It is a violation of that statute to give a second corporation a name substantially the same as that of a prior one.

5. TRADE-MARK—*must be affixed to a vendible commodity.* A trademark owes its existence to the fact that it is actually affixed to a vendible commodity. The mere adoption of words characterizing the commodity being manufactured and sold, in advertisements and circulars, will give the party using the same no exclusive right to their use.

6. SAME — *right of a man to use his own name.* The right of a man to use his own name in connection with his own business is so fundamental that an intention to entirely divest himself of such right and transfer it to another will not be readily presumed, but must be clearly shown.

7. SAME — *right to use the name of another.* Where a party sells out an established business, and with it his own name to be used in connection with such business, the vendee will acquire the right to the use of such name, and the vendor can not afterward resume it in carrying on the same business.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

This was a bill in chancery, brought by the Hazelton Boiler Company, a corporation organized under the laws of New York, against the Hazelton Tripod Boiler Company, a corporation organized under the laws of Illinois, and Charles B. Holmes, Milton W. Hazelton, Charles B. Hallett and W. E. Kirkpatrick, to restrain the defendants from using the name "Hazelton Tripod Boiler Company," the name "Hazelton Boiler," and the word "Hazelton," in their business of manufacturing and selling steam boilers.

The bill alleges that, in 1879 or 1880, Milton W. Hazelton represented to the parties now composing the complainant corporation, that he had invented certain new and useful improvements in steam boilers which he intended to have covered by patents, and desired them or some of them to become interested with him in the development thereof; that after various negotiations, an arrangement was made between him and Edward S. T. Kennedy, now one of the members of said corporation and the manager of its business, by which Kennedy became interested with him in said inventions, and that in pursuance of such arrangement, he, Kennedy, put in money, to the amount of several thousand dollars, to defray the expenses of procuring patents, conducting experiments and otherwise bringing said inventions to such point of practical

utility as would justify the establishment and building up of a business in the manufacture and sale thereof; that said experiments were carried on through a period of four years or more, and in their progress led to the making and adopting of various changes, so that, in the end, said boiler was very different from the one first presented, the improved boiler being of a particular and distinctive type, having a central standpipe or water-cylinder, and tubes extending radially therefrom, which peculiarity suggested the general name of "Porcupine" boiler, which was then given to it, and by which it has ever since, in a general way, been known.

That after experimenting as aforesaid, Hazelton and Kennedy concluded to engage in the manufacture and sale of said porcupine boilers, and to this end, arranged between themselves, and with others, to organize a joint stock company to take charge of and carry on said business; that after some consideration as to the name to be given said company, and particularly in view of the fact that said general form of boiler had been invented by Hazelton and had become somewhat known as the Hazelton boiler, it was finally agreed that said company should be called "The Hazelton Boiler Company;" that Hazelton fully consented to and acquiesced in the adoption of said name and the appropriation thereof to said business; that after said business had been started under this name, disagreements and misunderstandings arose which prevented the corporation from being fully perfected; that said business however was started by Hazelton and Kennedy, and from March, 1884, to July of that year, was carried on by them under said name; that during this period the business was widely advertised under said name, and some boilers were sold under the name of "Hazelton Boilers," by means whereof said boilers became further known in the market as the Hazelton Boiler.

That in July, 1884, after said business had been started and had become established under said name, said Hazelton

sold and transferred his entire interest in said business, and in the patents, trade-marks, trade-names, good-will and everything relating thereto, to John P. Kennedy, who is now another of the members of the complainant corporation, for $10,000; that it was distinctly understood and agreed, and formed a part of the consideration for which said $10,000 was paid, that the business should thereafter be conducted and carried on, and the boilers sold, under the same name, so that, by reason of his acquiescence in the adoption and appropriation thereof in the first instance and the subsequent sale of his interest in said business and everything connected therewith, Hazelton sold and assigned to John P. Kennedy the sole and exclusive right, so far as he was concerned, to the good-will of said business, and to the names, "The Hazelton Boiler Company," and "Hazelton Boiler," and thereby became and ever since has been estopped from claiming or asserting any right to use the same in connection with the business of manufacturing and selling porcupine boilers or in any similar business.

That after Hazelton retired therefrom, said business was carried on by Edward S. T. Kennedy, John P. Kennedy and William T. Kennedy, the last of whom became interested therein in September, 1884, but owing to various reasons, the formal incorporation of the complainant was delayed until June 23, 1888, at which date the complainant became fully incorporated under the laws of the state of New York, the three Kennedys above mentioned joining in said incorporation, and being then and having been ever since the only stockholders therein; that they have formally transferred to the complainant said business and the good-will thereof, trade-marks, trade-names, etc., but not including patents, the legal ownership of which, for convenience, was allowed to remain as before; that since said incorporation, the complainant has continued to carry on said business under the same name and at the same place.

32—142 ILL.

That the complainant manufactures and keeps in stock different sizes of standard boilers, and also manufactures special sizes to fill special orders; that its boilers are now sold and in use in nearly every State and Territory in the United States and in some foreign countries, and are so well known that the complainant is constantly receiving orders for them from points all over the country; that the word "Hazelton" is applied to and used on all such boilers manufactured by the complainant, being put upon the front doors thereof, and a name plate attached to the outside brick work, and it has been so applied and used on all such boilers manufactured by it and its predecessors since the business was started in 1884; that by virtue of its adoption and use, said word "Hazelton" became and is a trade-mark for boilers of the complainant's manufacture, and has been and is so recognized by manufacturers and dealers all over the country, who order boilers under the simple name, "Hazelton," or as "Hazelton Boilers," without further description or designation, except as to size; that the word "Hazelton" was thus adopted, appropriated and used as a trade-mark, as well as a part of the general name under which said business was started before said Hazelton sold out his interest and retired from said business, and all his right, title and interest in said word, as such trade-mark and as a part of such general name, was included in and transferred by him by his sale to John P. Kennedy, and afterwards in the transfer from said Kennedy to the complainant; that the complainant is thereby entitled to the sole and exclusive use of said names "Hazelton Boiler Company" and "Hazelton Boiler," the one designating the general name in which it carries on its business, and the other as the trademark or name for steam boilers of its manufacture.

The bill further alleges that the complainant and its predecessors have invested a large amount of money in perfecting said boiler and overcoming mechanical defects therein, and in advertising it, and have established a complete manufactur-

ing plant for building them on a large scale, said business not being yet on a paying basis, but promising to be profitable in the near future; that the complainant's predecessors had defendant Hallett in their employ for three years, whereby he became well acquainted with said business and the markets in which said boiler was sold; that Hazelton, after selling his interest in said business, went to Chicago and there engaged in the manufacture of porcupine boilers, calling them by the same general name under which the complainant's predecessors had introduced them to the market, that is, under the name of "Hazelton Tripod Boilers," and that the word "Hazelton" is thus used by the defendants for the fraudulent purpose of confusing the public mind and diverting the complainant's trade, by misleading purchasers into the belief that when buying a Hazelton Tripod Boiler, they are buying a genuine Hazelton Boiler of the complainant's manufacture; that in pursuance of this fraudulent intention, Hazelton afterwards associated said Hallett with him in said business, and that they have induced defendants Holmes and Kirkpatrick to become their associates, and that a company has been organized under the name of "The Hazelton Tripod Boiler Company," of which the defendants are the members and officers; that said name was adopted, as the complainant verily believes, for the purpose of still further deceiving and imposing upon the public, and to enable said parties to trade upon the reputation and good will of said porcupine boilers manufactured by the complainant; that the word "Tripod" used in said name is not sufficient to distinguish said company and its boilers from the complainant and the boilers manufactured by it.

That the defendants, since the organization of said company, have been carrying on the business of manufacturing and selling boilers under the name of "Hazelton Boilers," and in many ways have been seeking to divert away the trade established and built up by the complainant at great expense; that they have made use of the complainant's testimonials

from its customers, and in their circulars have referred to boilers manufactured by the complainant, showing their good points, and their course of business generally has been such as was calculated to confuse and has confused the public mind in reference to the manufacture of said boilers; that the defendants have no considerable amount of money invested in their business and have no plant, shops or other facilities for manufacturing boilers, but have them manufactured piecemeal where they can get the work done at the cheapest rates, and that the boilers manufactured by them are inferior and unsubstantial in construction and so unsatisfactory as to be very detrimental to the reputation of porcupine boilers manufactured by the complainant under the name of Hazelton Boilers.

The defendants answered denying the equities of the bill, and the cause being heard on pleadings and proofs, a decree was rendered dismissing the bill at the complainant's costs for want of equity. Said decree has been affirmed by the Appellate Court on appeal, and the present appeal is from said judgment of affirmance.

The evidence tends to show that, in the year 1881, Hazelton, having invented certain improvements in steam boilers, entered into an arrangement with Edward S. T. Kennedy to join him in the enterprise of manufacturing and selling said boilers, by which Hazelton and Kennedy, both being then residents of the city of New York, were to share the expenses and divide the profits of the enterprise equally. After carrying on the business for a time, dissensions arose between them which resulted in their separation, Hazelton coming west. In the early part of the year 1884, these differences having been reconciled, Hazelton returned to New York and entered into a new arrangement with Kennedy, by which it was agreed that a joint stock company should be formed, of which Hazelton, Kennedy, Henry F. Allen and Francis C. Britton should be the members, their interests in said company to be as fol-

lows, viz., Hazelton three-eighths, Kennedy three-eighths, Allen one-eighth and Britton one-eighth. After some discussion as to the name to be given to the proposed company, it was finally agreed, in Hazelton's absence, to call it "The Hazelton Boiler Company," and in reply to a letter written to him by Allen informing him of that decision, Hazelton wrote: "I expected the name of our company to be the New York Steam Generating Company. Many thanks for the compliment."

The proposed company was not organized, but in lieu thereof, Hazelton and Kennedy, sometime in March, 1881, entered into the business of manufacturing and selling said boilers as copartners, under the name of "The Hazelton Boiler Company," and continued said business under that name until the 10th day of July following, at which date Hazelton sold and assigned all his interest in said firm, its business and assets, to John P. Kennedy, the father of Edward S. T. Kennedy. The improvements in steam boilers of which Hazelton was the inventor were substantially as described in the bill, and Hazelton having obtained letters patent from the United States for said inventions, and several other patents for improvements in steam boilers, and as a part of the transaction by which he assigned his interest in said firm to John P. Kennedy, he also assigned to him said letters patent.

Said assignment bore date July 10, 1884, and expressed a consideration of $10,000, of which $1770 was to be paid down in cash, $2230 by the release and discharge of an indebtedness for that amount from Hazelton to John P. Kennedy, and the residue by Kennedy's six promissory notes for $1000 each, running from one to six years, and bearing interest at the rate of five per cent per annum. For this consideration Hazelton assigned to John P. Kennedy three patents, with all reissues and extensions thereof, or improvements on or in relation thereto, together with all inventions which Hazelton should thereafter make in relation to steam boilers, Kennedy to pay the expense of procuring patents therefor in the United

States and Canada. The portion of the instrument by which Hazelton assigned to John P. Kennedy his interest in said firm and its assets is as follows:

"The said Hazelton hereby sells, assigns and transfers to said John P. Kennedy all his right, title and interest in and to said business, its assets, profits and emoluments, as one of the associates therein, forever releasing to said John P Kennedy any and all claim, right or title the said Hazelton ever had, now has, or may have upon his associates for an accounting in said business or in relation to the profits thereof."·

By said instrument John P. Kennedy agreed to employ Hazelton and the latter. agreed to serve for the term of one year as salesman of boilers to be manufactured by said Kennedy òr his associates, and to receive for his compensation for such service a sum equal to ten per cent of the selling price of the boilers sold by him.

After said assignment Edward S. T. Kennedy seems at first to have carried on said business alone, but under the name of "The Hazelton Boiler Company," until sometime in September following, when his brother William T. Kennedy became associated with him therein, and the two afterwards carried it on as copartners, under the same name, until April 13, 1889, at which date they assigned said business, trade-marks, plant, good-will, buildings, machinery, etc., to the complainant, a corporation organized June 23, 1888, under the laws of New York, with the three Kennedys for its members. The relation which John P Kennedy bore to said business prior to the transfer of it to the complainant is not clearly shown by the evidence, but the evidence tends to show that he took no part in the business and was not a partner therein, but that he merely furnished financial aid to his two sons, who carried the business on, and who were its actual proprietors.·

Hazelton, after selling out his interest in the business, remained in the employ of the Kennedys in the capacity of salesman for about ten months, when he left them and re-

moved to Chicago. He afterward designed some minor changes in the structure of said boiler, particularly in the manner in which it was supported, and gave to the boiler thus modified the name of the Hazelton Tripod Boiler. He thereupon associated with himself defendant Hallett, who had been previously in the employ of the Kennedys and who had also removed to Chicago, and also defendants Holmes and Kirkpatrick, residents of Chicago, and the four, in February, 1888, organized a corporation under the laws of Illinois, by the name of "The Hazelton Tripod Boiler Company," having its principal office in Chicago, the object of said corporation, as declared by its certificate of incorporation being, to make and sell the Hazelton Tripod Boiler and any other appliance used in connection with steam boilers. The organization of said corporation was completed February 29, 1888, and Hazelton, Holmes, Hallett and Kirkpatrick became its stockholders, officers and managers. Said corporation thereupon, under the management of said parties, engaged in and has since been carrying on the business of manufacturing and selling said Hazelton Tripod Boiler, its place of business being in the city of Chicago.

Neither the complainant nor defendant corporation has ever been engaged in the business of disposing of its steam boilers by placing the same upon the market, both having confined themselves to dealings directly with customers purchasing for their own use and not for sale, the sales by each corporation being all made upon orders of customers addressed to it directly in New York or Chicago as the case happened to be, and neither kept any depository, warehouse or salesroom for the disposition of its engines except at its home office.

The further facts necessary to a proper understanding of the case are sufficiently stated in the opinion of the court.

Mr. EPHRAIM BANNING, Mr. THOMAS A. BANNING, and Mr. GEORGE S. PAYSON, for the appellant.

Messrs. BOND & ADAMS, for the appellees.

Mr. CHIEF JUSTICE BAILEY delivered the opinion of the Court:

This is a controversy between two corporations, one the Hazelton Boiler Company, organized June 23, 1888, under the laws of the State of New York, and the other the Hazelton Tripod Boiler Company, organized February 29, 1888, under the laws of this State, in which the former is seeking to restrain the latter from using its own corporate name, and from using the words, "Hazelton Boiler," and the word "Hazelton," in the transaction of its business of manufacturing and selling steam boilers.    Hazelton, Holmes, Hallett and Kirkpatrick are also named as defendants, but as it is not shown, either by the pleadings or proofs, that they are or have been using said names or words in the transaction of said business except in their capacity of officers and agents of the Hazelton Tripod Boiler Company, their rights and liabilities must necessarily depend upon those of their principal, the corporation, and they may therefore be omitted from the discussion.

So far as the suit relates to the right of the defendant corporation to make use of its own corporate name in the transaction of the business for which it was incorporated, it does not seem to us that the case presented is one upon which there can be any material difficulty or doubt.    In the pursuit of this part of the remedy sought, two obstacles seem to confront the complainant, both of which are apparently insuperable.    The first grows out of the fact that the complainant is a junior corporation seeking to contest with a senior corporation the right of the latter to the use of its corporate name, and the second arises from the position of the complainant as a foreign corporation seeking to contest with a domestic corporation the right of the latter to the corporate name given by the sovereignty which created it.

The incorporation of the defendant antedates that of the complainant by nearly four months, and, consequently, at the time the complainant was organized, the defendant had already

received and appropriated its corporate name, and if there has been any infringement, it is the complainant and not the defendant which is the aggressor. If the two names are substantially identical, as is claimed, the defendant's right, by virtue of prior appropriation, would seem to be paramount. Even if the complainant were accorded the same legal status which it would have held if it were a domestic corporation, the name given it, if the substantial identity of said name with that of the defendant is conceded, would have been in violation of that provision of section 2 of our statute in relation to corporations which forbids a license to be issued to two corporations of the same name.

But the complainant is in the attitude of a foreign corporation coming into this State and seeking to contest the right to the use of a corporate name which this State, in furtherance of its own public policy and in the exercise of its own sovereignty has seen fit to bestow upon one of its own corporations. For such a purpose, a foreign corporation can have no standing in our courts. Such corporations do not come into this State as a matter of legal right but only by comity, and they can not be permitted to come for the purpose of asserting rights in contravention of our laws or public policy. It is competent for this State, whenever it sees fit to do so, to debar any or all foreign corporations from doing business here, and whatever it may do by way of chartering corporations of its own, can not be called in question by corporations which are here only by a species of legal sufferance.

It follows from what we have said that the decree of the Superior Court was clearly right so far as it related to the use by the defendant of its corporate name. It remains to be seen whether the complainant has shown itself entitled to protection in the exclusive use, in its business of manufacturing and selling steam boilers, of the words "Hazelton Boiler" and the word "Hazelton."

If it be admitted that the assignment by Hazelton to John P. Kennedy of "all his right, title and interest" in and to the business of the firm of which Hazelton was a member, "its assets, profits and emoluments," was sufficiently broad to transfer to Kennedy all property rights which Hazelton had in any trade-mark or trade-name connected with said business, we are unable to find from the evidence that these words or any of them had been so adopted, appropriated or used in said business, prior to the retirement of Hazelton therefrom as to constitute them, in any legal sense, the trade-mark or trade-name of said firm.

It is a circumstance worthy of notice that no specific reference is made in said assignment to any trade-mark or trade-name, or to any peculiar property in or appropriation of said words or any of them to the steam boilers said firm were manufacturing and selling, or to the business in which the firm was engaged. Not only is this so, but all the witnesses agree that, in the negotiations which led to the execution of said assignment, no mention whatever was made of the subject of trade-marks, trade-names or the good-will of the business as a portion of the assets within the contemplation of the parties. None of these matters were discussed or apparently thought of, and the present contention is based solely upon the claim that the term "assets" of said business is sufficiently broad to include all possible property rights to which Hazelton, as a member of said firm, was in any way entitled, and so must be deemed to have included trade-marks and trade-names, if the firm, as a matter of fact, had, up to that time, become entitled to any such.

The evidence shows, as we have already seen, that when the business of said firm was commenced in March, 1884, the name "Hazelton Boiler Company" which had been agreed upon as the name of the corporation which the parties had proposed to organize was adopted and used as the firm name, and this, if anything, became the trade-name of the firm. There is

evidence tending to show that the boilers which Kennedy and and Hazelton manufactured and sold were known from the first, to some extent at least, as "Hazelton Boilers," and that said firm so denominated them in their advertisements and circulars, but these facts do not show the adoption of those words or of the word "Hazelton" as either a trade-mark or trade-name. A trade-mark owes its existence to the fact that it is actually affixed to a vendible commodity. Browne on Trade-Marks, sec. 91. There is no evidence, or if there is any, it is exceedingly slight, that the words "Hazelton Boiler" or "Hazelton" had been actually affixed to said boilers as a trade-mark prior to July 10, 1884. The mere adoption of these words in advertisements and circulars gave the firm no exclusive right to their use.

It is undoubtedly true, as was held in *Frazer* v. *Frazer Lubricating Company*, 121 Ill. 147, that where a party sells out an established business, and with it his own name, to be used in connection with such business, his vendee will acquire a right to the use of the name, and the vendor can not afterwards assume it in carrying on the same business. That case, however, differs essentially from this in the fact that there the vendor, in the instrument by which the business was sold, expressly authorized the vendee to use his name as a trade-mark, or as indicating the material or product theretofore manufactured by the vendor, and conferred upon the vendees the exclusive authority to use his name for such purpose.

But in the present case there is no reference, in the instrument by which the business was transferred, to the use in connection with said business, of the vendor's name, either exclusively or otherwise. The transfer of the exclusive right to the use of said name is sought to be made out from the mere fact that said instrument assigned all the assignor's interest in the assets of the business, and trade-marks and trade-names, if such there were, are claimed to have been a part of the assets assigned. The right of a man to use his own name

in connection with his own business is so fundamental that an intention to entirely divest himself of such right and transfer it to another will not readily be presumed but must be clearly shown. Where it is so shown the transaction will be upheld. But it will not be sustained upon doubtful or uncertain proof. All the circumstances surrounding the execution by Hazelton of the assignment of his interest in the business tend to negative the assumption that any property in a trade-mark or a trade-name was within the contemplation of the parties, and the evidence, to say the least, leaves it doubtful whether the firm, at the time said assignment was made, had any property rights of that character. We therefore think that the intention on the part of Hazelton to divest himself of the right to use his own name in any business in which he might see proper to engage, is not shown with such clearness and certainty as would justify the courts in undertaking to enforce it.

We are also of the opinion that there is a failure by the complainant to show any improper interference by the defendant with the complainant's business of manufacturing and selling steam boilers. The complainant's place of business is in the city of New York, while that of the defendant is in the city of Chicago. Neither puts its steam boilers on the market to be sold by retailers or middle-men to the final purchaser, but both deal directly with customers who purchase boilers for their own use, and who give their orders directly to the complainant or defendant as the case may be. In this way the liability of intending purchasers to be deceived into mistaking boilers of the defendant's manufacture for those of the complainant, if not wholly obviated, is reduced to the minimum. It is difficult to see how purchasers of ordinary intelligence dealing directly with the manufacturers could be misled into confounding two such establishments situated nearly one thousand miles apart.

But whether this is so or not, the evidence fails to show any act on the part of the defendant either intended or calculated

to deceive in this respect.   Unquestionably the two establishments are rivals, and as they are manufacturing and selling boilers of very similar construction and qualities, and are each seeking to avail themselves of the markets of the country, the competition between them is doubtless sharp and energetic.   But competition, when conducted fairly, and with no intention or attempt to deceive, gives no legitimate ground for complaint.   It is to be encouraged rather than condemned. It is not shown that the defendant has ever attempted in any way to palm off its own boilers as being of the complainant's manufacture.   On the other hand, the evidence seems to show more than ordinary efforts on the part of the defendant to apprise the public that it and the complainant were two separate concerns having no connection with each other, and that its boilers were different from those manufactured by the complainant.

If any confusion has occurred, it has arisen from the similarity of the two corporate names, and not from any attempts on the part of the defendant to deceive.   But, as we have already held, the similarity of names is a circumstance of which the complainant has no right to complain, the defendant having at least as good a right to the use of its corporate name in the transaction of its business as the complainant has to use its name.   If injury results to the complainant from such cause, it is *damnum absque injuria.*

Much reliance, however, is placed upon evidence that the defendant, in selling its steam boilers, took the liberty to refer its customers to certain boilers still in use manufactured and sold by Hazelton and Kennedy while they were in business together, such reference being made for the purpose of showing the durability and other desirable qualities of boilers of that class ; and also that the defendant had, to some extent, availed itself of recommendations given to the complainant by its customers commendatory of boilers of the same class manufactured and sold by the complainant.   So long as it does

not appear that the defendant did this by way of deceiving intending purchasers into the belief that the boilers in which the defendant was dealing were of the complainant's manufacture, we are unable to see that there was anything legally improper in all this. These boilers being all constructed upon the same general plan and operating in the same general way, it was not illegal or improper for the defendant, in order to show the capabilities and qualities of its own boilers, to refer its customers to examples of boilers manufactured by the complainant, or refer its customers to what people who had used the complainant's boilers were disposed to say in their praise. There was no trade secret in their manufacture which was hedged about by any sanctity which the defendant was not at liberty to invade. So far as boilers involving the same principle and plan of construction were in use, it had a right to refer to them as evidence of the capabilities of its own, without reference to who built them. If those owning and using them were willing to allow them to be examined by the defendant's customers, the complainant had no ground of complaint. When it sold said boilers, it parted with all interest in them, and so long as their construction was not covered by valid patents, a thing which is not now claimed, no reason is to be perceived why the defendant was not as much at liberty as the complainant to refer to such boilers and make use of them as examples of the capacity and qualities of boilers of that general class.

In view of the whole record, we think the complainant has failed to show itself entitled to relief, and that its bill was properly dismissed for want of equity. The judgment of the Appellate Court affirming the decree of the Superior Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE SHOPE: I concur in the conclusion reached, but not in all of the reasoning of this opinion.