CHICAGO—FIRST DISTRICT—MAY, 1923.    549

Nestor Johnson Mfg. Co. v. Alfred Johnson S. Co., 229 Ill. App. 549.

## Nestor Johnson Manufacturing Company, Appellee, v. Alfred Johnson Skate Company, Appellant.

### Gen. No. 28,162.

1. TRADE-MARKS AND TRADE NAMES—*when unfair competition by use of proper name not proven in injunction suit.* A perpetual injunction against the use of the name " 'Johnson' in its secondary sense" in the manufacture and marketing of tubular ice skates, based on a finding that the founder of complainant company, bearing that surname, had introduced the use of a peculiar type of tubular skate from Norway, and that such founder and complainant had manufactured and sold that type of skate so that it had come to be known as "Johnson skates" and that the name had gained a secondary meaning describing and indicating the particular make of tubular skate manufactured by complainant, where the evidence shows that defendant company took its name from that of its president who is one of the principal stockholders, that most of the skates manufactured and sold by complainant were sold under a specific trade name other than "Johnson" and were known to the trade by such trade name, that other concerns had manufactured and sold tubular skates under the same name before complainant used it, and that it was first applied to such skates because of their use by another person of that name, and that defendant had not practiced any deception although some confusion had arisen from the use of the name and certain similarities in catalogs and advertising.

2. TRADE-MARKS AND TRADE NAMES—*delay as barring right to injunction against use of trade name.* A delay of two and one-half years in filing suit to enjoin the use of the name "Johnson" in connection with the manufacture and sale of skates amounts to such acquiescence in the use of the name as to defeat the right to relief where it appears that during such period of time defendant had conducted an extensive advertising campaign and had used the same methods of advertising, trade practices, forms- of stationery, labels, boxes, etc., complained of, that its place of business was near that of complainant, that its product had been sold to the same trade and in the same field as that of complainant, that its business had become prosperous, and that complainant had been fully informed as to its acts and methods from the beginning.

Appeal by defendant from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the Branch Ap-

pellate Court at the October term, 1922. Reversed and remanded with directions. Opinion filed May 31, 1923.

**Statement by the Court.** On September 18, 1919, complainant (an Illinois corporation with principal office and factory in Chicago, Illinois, and hereinafter referred to as the complainant company) filed its bill in the superior court of Cook county for an injunction and an accounting against the Alfred Johnson Skate Company (an Illinois corporation also having its principal office and factory in Chicago, and hereinafter referred to as the Skate Company) and Julian T. Fitzgerald, Alfred Johnson and Gustav E. Schmidt. The bill prayed that the Skate Company "be enjoined and restrained from the further use of the name 'Johnson' as any part of its corporate name" and "be decreed to account to your orator for all the profits which it has made by said fraudulent use of the name 'Johnson' or in imitation of the advertising methods and devices used by your orator"; that the Skate Company and the other three defendants, their attorneys, agents, etc., "be enjoined and restrained from manufacturing, selling or offering for sale, directly or indirectly, any tubular ice skates under the name of 'Johnson,' or connected in any way with the name 'Johnson,'" and "from simulating in any manner the distinctive stamp, labels, trade-marks, trade names, packages, catalogs or other advertising matter of your orator," and that they and each of them be decreed to account to complainant for all profits and dividends which may have accrued to them by reason of their wrongful acts, etc. The Skate Company and the three other defendants filed a joint and several answer in which they denied practically all of the material allegations of the bill and denied that complainant was entitled to the relief sought. The cause was referred to a master in chancery to take proofs and report the same, together with his findings

and conclusions, both as to the issuance of the injunction and as to the accounting. There was a lengthy hearing, at which much testimony and a mass of exhibits were introduced. In his report, filed March 13, 1922, the master made many findings of fact and at the end of his report stated in substance that the acts of the Skate Company and the other defendants, as by him found, were "constructively fraudulent" and should be enjoined, although he further stated that said defendants "were not conscious of wrongdoing," and had been "shabbily used by Nestor Johnson." He recommended that a decree be entered enjoining all the defendants "from carrying on their business as hereinbefore found under the name of the Alfred Johnson Skate Company in such a way as to cause the public to believe that the product of the Alfred Johnson Skate Company was the product of the Nestor Johnson Manufacturing Company." He did not recommend that any accounting should be had. Complainant filed exceptions to the report and defendants' objections were ordered to stand as exceptions before the court. On May 26, 1922, the court entered its final decree in which, after making many findings of fact, it ordered that complainant's bill be dismissed without costs as to the individual defendants, Fitzgerald, Schmidt and Alfred Johnson, and further ordered that the exceptions of the defendant Skate Company to the master's report be overruled and that said report be approved as to it, and further ordered and decreed that the Skate Company, its officers, agents, etc., be *perpetually enjoined and restrained:*

"*First,* from using in the advertising, disposition, distribution or sale of tubular ice skates upon any skate, box, container, letterhead, catalog, literature, sign, advertising matter, or otherwise, or verbally, the word 'Johnson' in its secondary sense as hereinbefore defined, in the description or partial descrip-

tion of, or as the name or part of the name of, a tubular ice skate.

"*Second*, from using in the advertising, disposition, distribution or sale of tubular ice skates, upon any skate, box, container, letterhead, catalog, literature, sign, advertising matter, or otherwise, the name 'Alfred Johnson Skate Company' in print, script or writing in any form without the four words of said name set forth in equal prominence and in the same character and size of type, script or writing, and without adding thereto in type, a script or writing of the same character and not less than two-thirds the size of the said type, script or writing by which the said name 'Alfred Johnson Skate Company' is displayed, the words 'Not connected with the original Nestor Johnson Manufacturing Company.'"

The court taxed all costs, including the master's and stenographer's fees and amounting in all to about $1,950, against the Skate Company, and further ordered and decreed that complainant company was entitled to an accounting from the Skate Company for all profits accruing to it "from the use of the trade name 'Johnson' in its secondary sense as hereinbefore defined applied to tubular ice skates made, sold or delivered by said defendant at any time subsequent to the date of service of summons upon said defendant upon the bill herein," and that the cause be again referred to a master to take proofs upon said accounting as to profits.

From this decree the Skate Company prayed and perfected the present appeal. The complainant company has assigned cross errors, urging that the court erred in not enjoining the Skate Company from using the name "Johnson" in its corporate name or in the description of a tubular ice skate, and in dismissing the bill as to said individual defendants and in not also enjoining them.

In the decree the court made findings in substance as follows: That the complainant company is an Illi-

nois corporation, has its established place of business at No. 1237 North California Avenue, Chicago, and since its incorporation by Nestor Johnson in 1912 has been and is now engaged in manufacturing and selling a peculiar form of tubular ice skate generally in the United States and Canada and has built up a large and successful business of great value; that Nestor Johnson (who gave his name to the complainant company and upon its organization conveyed to it his entire business and good will) came to this country about 1890 from Norway, and shortly after his arrival here won considerable notice as an ice skater, using said peculiar form of skate then made only in Norway, and developed a large personal acquaintance and successfully promoted many skating clubs and skating associations; that Nestor Johnson was a machinist by trade, and during his first and early years in this country followed his trade in the daytime, and in the evening worked with his wife's assistance on bicycles and tubular ice skates; that in 1895 such form of skates made by him were being sold in Chicago by a well-known merchant in sporting goods, and in 1900 in New York City and in the cities of St. Paul and Minneapolis, Minnesota; that in 1913, after the complainant company had been organized, about 4,000 pairs of such skates were made, and from that time on its business rapidly increased in volume; that the skates first manufactured by Nestor Johnson and afterwards by the complainant company, and which were quite similar in pattern to the original Norwegian skates, "consisted of a steel blade or runner inserted in a cylindrical steel tube which supported two upright cylindrical steel tubes, one for the ball of the foot and the other for the heel," and the skates were "then secured to the sole and heel of a special skating shoe made of leather"; that "the tubular ice skates manufactured by the complainant, and its predecessor Nestor Johnson had, prior to the

year 1917, come to be, and were then, known to skaters and the trade in general as 'Johnson skates,' and that the word 'Johnson' had ceased to be only the name of the manufacturer and *had gained a secondary meaning describing and indicating the particular make of tubular ice skates of Nestor Johnson Manufacturing Company, the complainant"*; that the Skate Company is an Illinois corporation and was incorporated in March, 1917, and established its place of business at No. 2812 North Avenue, Chicago; that the defendants, Alfred Johnson, Fitzgerald and Schmidt, reside in Chicago and are officers of said Skate Company, that Alfred Johnson is a brother of Nestor Johnson and early in life was apprenticed to the trade of shoemaker in Norway (the father having worked as cobbler for skatemakers there) and early in life made many shoes for said skatemakers; that following a visit to Norway which Nestor Johnson made in 1901, Alfred Johnson accompanied Nestor on the latter's return to Chicago, and thereafter and until 1916 resided with Nestor Johnson's family, first being employed by Nestor Johnson and afterwards by the complainant company; that early in the year 1917, Alfred Johnson was still in its employ, having charge of the assembly of skates in its factory, and receiving wages of $30 per week and a bonus based upon sales; that the defendant Fitzgerald entered the employ of Nestor Johnson in 1912, and afterwards became an employee of the complainant company, and later its secretary and sales manager, having charge of the office and books of the company and conducting most of its correspondence; that the defendant Schmidt entered the employ of Nestor Johnson in 1908, and afterwards became an employee of the complainant company, having general charge of the press room and engaging in the work of making dies, perfecting machinery, etc.; that in January, 1917, said three defendants, Alfred Johnson, Fitzgerald and Schmidt,

decided to leave the employ of the complainant company, "because of the plan announced by Nestor Johnson to put in the factory a general superintendent senior to these three men"; that at this time Nestor Johnson owned a majority of the stock of the complainant company, and that each of said three defendants owned about three shares of said stock which they sold either to Nestor Johnson or others before the Skate Company commenced doing business; that in March, 1917, said three defendants, together with Stanley W. Blum and J. G. Landauer, organized the Skate Company which had for its object the manufacturing and selling generally to the trade of tubular ice skates; that said Blum was a resident of New York but was largely interested in a Chicago company which sold sporting goods of all kinds, and said Landauer was Blum's Chicago representative and confidential agent; that the Skate Company was organized with a capital stock of $20,000, of which stock said defendants, Alfred Johnson, Fitzgerald and Schmidt, each subscribed for and each thereafter became the owner of $3,400, par value,— Landauer $3,400 and Blum $6,400; that Alfred Johnson was made president, Schmidt vice president, Fitzgerald, secretary and sales manager, Landauer, treasurer, and Blum assistant treasurer; that it selected a building then owned by Alfred Johnson at No. 2812 North Avenue, Chicago, for its factory and offices, which building was and is about one-half mile from complainant's factory, and faces, as does complainant's factory, upon Humboldt Park, "the skating center on the Northwest side of Chicago"; that during the spring of 1917, about the time the Skate Company commenced manufacturing and selling skates, which were very similar to those manufactured and sold by complainant, Nestor Johnson sold all of the stock which he owned in complainant company to James W. Clark, and ceased to be connected

with said company; that said Skate Company, shortly after its organization, commenced manufacturing and selling tubular ice skates, issued cards, catalogs and letters to the trade and instituted an intensive advertising campaign; and that the Skate Company prospered from its inception and built up a large and profitable business in tubular ice skates. The court in its findings refers to the similarity in the trade names used by both companies in connection with different grades of skates, to the similarity in methods of advertising, to the similarity in stationery and catalogs, and to the similarity in the pasteboard boxes in which the skates were packed and sold to the trade. And the court stated that, because of the facts as found, there resulted in the minds of the public "confusion"; that in a "few" instances ordinary purchasers of skates received the product of the Skate Company when they expected to get the product of the complainant company; that in a number of instances retailers and wholesalers purchasing skates were confused by reason of the similarity of the catalogs and newspaper advertisements of the two companies; that some confusion in deliveries of mail and of merchandise was shown; and that complainant was entitled to the perpetual injunction as issued.

ISAAC S. ROTHSCHILD, for appellant.

ZANE, MORSE & NORMAN, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

Among the findings of the court in the decree appealed from are that "the tubular ice skates manufactured by the complainant and its predecessor Nestor Johnson had, prior to the year 1917, come to be, and were then, known to skaters and the trade in general as 'Johnson skates,'" and that "the word

Nestor Johnson Mfg. Co. v. Alfred Johnson S. Co., 229 Ill. App. 549.

'Johnson' had ceased to be only the name of the manufacturer and had gained a secondary meaning describing and indicating the particular make of tubular ice skates of Nestor Johnson Manufacturing Company, the complainant." And the court perpetually enjoined the Skate Company, *first* from using, in the advertising, distribution or sale upon any skate, box, letterhead, etc., "the word 'Johnson' *in its secondary sense as hereinbefore defined,*" in the description or partial description of, or as the name or part of the name of, a tubular ice skate, and, *second,* from using, in the advertising, distribution or sale upon any skate, box, letterhead, etc., "the name 'Alfred Johnson Skate Company' in print, script or writing in any form without the four words of said name set forth in equal prominence," etc., "and without adding thereto in type," etc., "the words 'Not connected with the *original* Nestor Johnson Manufacturing Company.' "

The name "Johnson" is a well-recognized family surname. It is the law that a personal name cannot be exclusively appropriated by any one as against another having a right to use it in his business. (38 Cyc. 807; *Meneely v. Meneely,* 62 N. Y. 427, 431; *Singer Mfg. Co. v. June Mfg. Co.,* 163 U. S. 169, 187; *Howe Scale Co. v. Wyckoff,* 198 U. S. 118, 134.) And it makes no difference whether that other's name is used in a firm or an incorporated company, provided there is no dishonesty in its use. (38 Cyc. 817; *Howe Scale Co. v. Wyckoff,* 198 U. S. 118, 136.) In the case last cited it is said (p. 140) : "Having the right to that use, courts will not interfere where the only confusion, if any, results from a similarity of the names and not from the manner of the use. The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another, and if defendant so conducts its business as not to palm off its goods as those of complainant,

558    APPELLATE COURTS OF ILLINOIS.

Nestor Johnson Mfg. Co. v. Alfred Johnson S. Co., 229 Ill. App. 549.

the action fails.  *  *  *  We hold that, in the absence
of contract, fraud or estoppel, any man may use his
own name, in all legitimate ways, and as the whole or
a part of a corporate name." Hence, it would seem to
follow that the mere use of the name "Johnson" in
defendant's corporate name, especially where as here
the evidence discloses that Alfred Johnson is its
president and owns a considerable amount of its capi-
tal stock, is not a ground for the issuance of the in-
junction. The burden was upon the complainant com-
pany to prove something more. As this is an "un-
fair competition" case and as there is no question
here involved of contract or estoppel, the basis of
complainant's action is fraud. It was not claimed
that the Skate Company had directly attempted to
palm off skates manufactured by it as the skates of
the complainant company. The theory of the action
was in substance (1) that the word "Johnson," as
used by Nestor Johnson and afterwards by complain-
ant company, had ceased to indicate only the name of
a manufacturer of tubular ice skates but had gained
a secondary meaning indicating a particular make of
such skates manufactured by complainant company
and by it alone, and (2) that the Skate Company was
using the name "Johnson" in its said secondary
meaning in its corporate name, business, advertise-
ments, etc., and thereby was in effect passing off the
skates manufactured by it as those of the complainant
company. In 38 Cyc. 769, it is said:

"Words or names which have a primary meaning
of their own, such as words descriptive of the goods,
or the place where they are made, or the name of the
maker, and which are not capable of exclusive appro-
priation as a trade-mark, may nevertheless by long
use in connection with the goods or business of a
particular trader come to be understood by the pub-
lic as designating the goods or business of that par-
ticular trader. Such words have both a primary and
secondary meaning. In their primary descriptive

sense, they are *publici juris,* and all the world may use them, but they must be used in such a way as not to falsely convey the secondary meaning, for this would constitute unfair competition as tending directly to pass off the goods or business of one man as and for that of another. This is what is known as the doctrine of secondary meaning. * * * In all this class of cases where the word, name, or other mark or device is primarily *publici juris* the right to relief depends upon the proof. If the plaintiff proves that the name or word has been so *exclusively* identified with his goods or business as to have acquired a secondary meaning, so as to indicate his goods or business *and his alone,* he is entitled to relief against another's *deceptive* use of such terms. If he fails in such proof, he is not entitled to relief."

In *Kellogg Toasted Corn Flake Co. v. Quaker Oats Co.,* 235 Fed. 657, 664, decided by the Circuit Court of Appeals of the sixth circuit, it is said:

"If the words in issue in the instant case constitute a technical trade-mark, use by others of the mark would be presumed to be made with wrongful intent and so would be enjoined. * * * This, however, is not the rule in respect of the use by others of descriptive words which have acquired such secondary significance as is here urged. * * * It is conceded that the burden of proof is upon the appellant to establish such secondary meaning; and this is a substantial burden, since the ultimate fact to be proved is fraud, that is, that defendant is using the words in their secondary, not simply their primary, sense, and with the result of passing off its goods as the goods of appellant."

In *Hanover Star Milling Co. v. Allen & Wheeler Co.,* 208 Fed. 513, 518, decided by the Circuit Court of Appeals of the seventh circuit, it is said:

"In both the 'trade-mark' and the 'unfair competition' cases the ground of the action and the reason for the remedy are identical. They are all cases of unfair competition in trade, and the remedy is to tie the hands of the unfair trader. To the extent that differences exist, they pertain, not to the underlying

principle, but to the methods and degrees of proof required to enforce the principle. If a dealer has adopted a true trade-mark, his trade has given the mark its only meaning, and he need produce no other proof respecting meaning. If he has applied to his article a mark or name that had an existing meaning, it is incumbent on him to establish the fact that his trade *has added a new meaning* that is *exclusively* appendant to his trade. If a defendant has put into a common market his articles bearing another dealer's technical trade-mark, no further proof of fraud is required. If a defendant has put into a common market his articles bearing a mark or name that had a *common meaning*, the complainant must show that the defendant is using the mark or name, not in its *common meaning*, but in its *new* meaning *created by the complainant.*"

The record in the present case, including the many letters, circulars, advertisements and other exhibits, is very voluminous. We have carefully examined the testimony and many of the exhibits and are of the opinion that the complainant company did not sustain the burden, which the law casts upon it, of proving the secondary meaning of the name "Johnson" as claimed, or of proving that the Skate Company used that name in its secondary meaning and thereby passed off the skates manufactured by it as those of the complainant company. To discuss the evidence bearing on these points in detail would unnecessarily extend this opinion and serve no useful purpose. Suffice it to say that in our opinion the entire evidence discloses that most of the skates of the complainant company were advertised and sold under the trade name "North-Star" and were known to the trade as "North-Star" skates rather than "Johnson" skates; that several other concerns in the United States at various times manufactured and sold tubular ice skates which were known in certain localities as "Johnsons"; that the name "Johnson" was first given to such skates because of their use prior to 1895 by a

celebrated skater, named John S. Johnson; and that as early as 1895, and thereafter, certain individuals manufactured and sold such skates, advertising them as "John S. Johnson's Speed Skates." And our conclusion is, under the law and the facts in evidence, that the above-mentioned finding of the court (viz., that the word "Johnson" had ceased to be only the name of the manufacturer and had gained a secondary meaning describing and indicating a particular make of tubular ice skate, manufactured and sold by complainant company and by it alone) is not sustained by the evidence, and that the decree appealed from is not warranted, either as to the injunction or the accounting. It is true, as found by the court, that some confusion arose in the skate trade and in minds of some purchasers of tubular ice skates as the result of the acts of the Skate Company, but, in our opinion, this confusion resulted, not from any deception practiced by the Skate Company, or its officers or agents, but rather from the word "Johnson" appearing in the corporate names of the parties, and from certain similarities in the catalogs and advertisements of the parties and in the pasteboard boxes in which the skates were packed and sold. In *Meneely v. Meneely,* 62 N. Y. 427, 432, it is said: "Where the only confusion created is that which results from the similarity of the names the courts will not interfere." (See also, *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.,* 142 Ill. 494, 509.) In *Ball v. Siegel,* 116 Ill. 137, 146, it is said: "The court is not bound to interfere where ordinary attention will enable purchasers to discriminate between the trade-marks used by different parties." And we do not think that the evidence as to confusion was such as warranted the decree. (See *United States Tobacco Co. v. McGreenery,* 144 Fed. 531, 534; *Viavi Co. v. Vimedia Co.,* 245 Fed. 289, 293; *De Long Hook and Eye Co. v. Hump Hairpin Mfg. Co.,* 297 Ill. 359, 369.) What is said in the

*Hump Hairpin* case, *supra,* p. 370, is here applicable, viz.: "Even a casual observer would readily distinguish the appellant's packages and advertisements from those of the appellee. If purchasers were mistaken it was not because they were deceived by false representations, and equity will not enjoin against telling the truth."

Counsel for the Skate Company in his brief here filed contends, in addition to his main contention that the injunction on the merits of the case was wrongfully issued, that complainant's delay in instituting suit should alone defeat the action. The bill was filed on September 18, 1919. The Skate Company was incorporated in March, 1917. It appears from the evidence in substance that immediately after incorporation the Skate Company commenced doing business, adopted various trade names for different grades of skates manufactured by it, issued circulars, letters and catalogs to the trade and entered upon an intensive advertising campaign; that its methods of advertising, trade practices, forms of stationery, labels, boxes, etc., continued practically the same as in the beginning; that its place of business was located about one-half mile from complainant's; that it sold its product to substantially the same trade and in substantially the same field; that its business became a prosperous one; and that complainant was fully informed as to its acts and methods from the beginning. And counsel argues that complainant's failure to take any steps for over two years and until the present bill was filed to stop the Skate Company from doing the acts complained of amounts to such acquiescence by it in the Skate Company's acts as is sufficient to warrant a dismissal of the bill. We think that there is merit in the contention and the argument. And what is said in *Valvoline Oil Co. v. Havoline Oil Co.,* 211 Fed. 189, 194, may here be quoted, viz.:

"I think we must realize modern conditions. Men can build up new businesses these days in a period of time which would have seemed amazingly short years ago. It is true that mere acquiescence will not preclude injunctive relief, but whether a case falls within the principle of *Menendez v. Holt,* 128 U. S. 523, * * * or within *Richardson v. Osborne & Co.,* (C. C.), 82 Fed. 95, affirmed 93 Fed. 828, * * * depends, of course, on the particular facts and circumstances. Where a trade-mark is bodily appropriated, as in *Menendez v. Holt,* the courts will grant injunctive relief, although in some instances denying an accounting. See also, *Mosler & Co. v. Lurie,* 209 Fed. 364. * * * But this is not such a case. * * *

"I am of opinion that equity as applied to modern business developments requires that, in this particular case, injunctive relief in any event be denied. No satisfactory explanation is given for the delay, and, during that time, the defendants have spent thousands of dollars to create a valuable asset in the word 'Havoline.' Complainant is not uninformed, as in *Mosler & Co. v. Lurie, supra,* but is a business corporation in this very same kind of business.

"There are cases where delay is excusable because it is necessary to obtain essential testimony or because a person unfamiliar with the subject-matter is ignorant of his rights, or where there is some situation that shows that a defendant should not be permitted to go on with his own wrongful conduct just because he has continued it for a long time.

"But it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question."

For the reasons indicated we are of the opinion that the court erred in entering the decree appealed from and that the decree should be reversed and the

cause remanded with directions to dismiss complainant's bill for want of equity, and it is so ordered.

*Reversed and remanded with directions.*

BARNES, P. J., and FITCH, J., concur.